### *In re* BUSHNELL.

*(Surrogate's Court, Madison County.* June 18, 1888.)

1. GUARDIAN AND WARD—ACCOUNTING—CLAIM FOR BOARD.

Where a ward, a girl, is employed by her guardian, who is her mother, during the guardianship, in doing coarse farm labor, and the guardian has misappropriated the ward's personalty to an amount nearly equal to the guardian's claim for board, such claim will be disallowed.

2. SAME—CLOTHING.

Where the guardian is a parent of the ward, a claim for $284, alleged to have been expended for clothing during the 12 years of guardianship, $200 of which are charged in a gross sum, no account of the items or of their cost having been kept, will not be allowed.

3. SAME—HOUSEHOLD FURNITURE.

Such guardian cannot be allowed for articles of household furniture purchased by her, and used in her own house by her and her ward in common, the latter not being, or about to be, married.

4. SAME.

The entire account of such guardian also should be disallowed, and commissions refused, where she purchased land of her ward, giving a mortgage for the price, $4,386, and has had the use of the land, and paid no interest, for 17 years, and has converted personalty of the value of $1,131, and where the ward's estate, if properly cared for, would have amounted to at least $15,000.

On accounting by Harriet L. Bushnell, as guardian of May Burlingame. *C. A. Hitchcock,* for accountant. *S. M. Wing,* for ward.

KENNEDY, S. Zina Bushnell was a resident of the town of Sullivan, in this county, and died October 29, 1869, leaving him surviving his widow, Harriet L. Bushnell; two children, May and Belle Bushnell, by his last wife; and Horatio H. Bushnell, Almanzo Bushnell, and Armenia Tuttle, children by a former wife. At the time of his death he was the owner of several hundred acres of land, and personal property to such an amount that upon the final judicial settlement of his estate the widow received $1,828.38, and the share to which May and Belle were severally entitled was the sum of $1,131.36. Mrs. Bushnell was the administratrix of her husband, and was appointed general guardian of her two children on the 22d day of January, 1870. Upon the final settlement of the estate the amount due her as widow, and to the two children May and Belle, was set off in stocks, mortgages, money in savings-banks, and other satisfactory securities, and possibly some money which she then, as widow and as guardian, accepted in full settlement and satisfaction of the amount due to all of them. As guardian she did not, upon the receipt of these trust funds, separate the securities and money for the purpose of setting apart to each of her children the amount which she held for them as guardian, nor did she ever set apart this fund or invest it, but, as fast as the money was realized on the securities set off to her and her children, it was expended by her for her own private use in carrying on her farm and in improvements upon her property; and she has continued to hold and have the use of May's share, thus mixed with her own funds and used by her, up to the present time. The evidence shows that Mrs. Bushnell, at the time of her husband's death, owned in her own right a farm of 50 acres in the town of Sullivan; that after the partition of Zina Bushnell's land she purchased so much of the land as her two daughters were entitled to in her husband's real estate, amounting to 217 acres, and as security for the purchase price gave a mortgage on the land so purchased to the county treasurer of this county for the sum of $8,772.37, this sum being the value of her children's interest in their father's real estate. Mrs. Bushnell, since her husband's death, has continued to own and occupy all the land above specified, except so much thereof as she deeded to Belle a few years since in payment of the amount due her from Mrs. Bushnell as her guardian. We also understand Mrs. Bushnell has managed her farm, hiring a little help occasionally, but taking care of her

stock generally during the winter herself, with the assistance of her two daughters, until they married and left home. May remained at home till her marriage, at 17 years of age, growing up a strong, healthy woman. Aside from four terms at Yates Union School, at Chittenango, and three terms of music lessons, no money was spent in giving her an education. She had no advantages, save those of the district school. During the years she lived at home she assisted her mother in doing house work and various kinds of farm work, such as driving the horse to take the milk to the cheese factory, assisting in planting, working in the hay field, driving horse to drag in grain, driving the cows to and from the pasture, and, from the time she was 10 years old, assisting in milking the cows, taking care of the horse and cows and other stock during the winter time, by feeding them from the mows of hay, by cleaning the horse and cow stables, either by shoveling or wheeling the manure from such stables to the barn-yard; doing, generally, aside from house work, such farm work as no girl of her age ought to have been required to do, and which no woman ought to do, except as a matter of necessity. We are surprised that persons who knew the class of farm work May did from the time she was 10 years old till her marriage did not inform the surrogate of the facts, and request him to cause an investigation to be made to ascertain whether Mrs. Bushnell was a suitable person to be a guardian of her child. The daughter of Zina Bushnell, a man respected and honored by all who knew him, with ample property to support and educate his children, ought to have received a better education than she did; ought to have been surrounded by no influences demoralizing to a young girl; ought to have been permitted to spend her winter nights and mornings by the fireside or in the school-room, rather than in the cow stable or horse barn; ought to have enjoyed those advantages of education and society which the daughters of men as wealthy as Mr. Bushnell are entitled to receive. But Mrs. Bushnell, from the death of her husband, had accustomed herself to doing the class of outdoor work to which we have referred, and hence saw no impropriety in requiring her daughters to do likewise. And yet we have no doubt that in managing the farm as she did, paying as little to hired men as possible, doing all that it was possible for her and her daughters to do of farm work, she was actuated by no unkind motive towards her children; from her stand-point she thought it right to make and save money in doing as she did for the benefit of her children; that she was desirous of managing her estate with the least possible expenditure, to benefit them in the future rather than herself; was trying in her way to accumulate property for her daughters. She did not appreciate the fact that she was guardian of her children, and so might at some time be called to account for her stewardship. She had become the owner of their lands, paying nothing therefor; she had their personal property in her possession, and both funds have been used as one by her as if they were her own, only to be parted with at death. Whether she has made or lost money in conducting business as she has, we have no evidence in this proceeding upon which to base any knowledge. She claims she owes her daughter nothing, and has filed an account against her amounting to $2,715.42, which the court is asked to approve and allow.

One item of this account is for 12 years' board, at $2 per week, amounting to $1,248. This item we disallow, because we think May, from the time she was 10 years old till she left home, at 17 years of age, more than earned her board by the outdoor work she did for her mother upon the farm. We disallow it also for the reason that Mrs. Bushnell misappropriated the $1,131.36 belonging to May; converted it to her own use, instead of investing it and keeping it invested; thereby producing an income which could have been used, if necessary, for her support. Were she not her mother, and had not acted in good faith, as she supposed, towards her child, we should not hesitate to charge her with compound interest upon the sum she received, but, under

the circumstances of this case, we shall hold that the benefits she has derived from the use of her ward's money are more than an equivalent to the trifling sum which she might otherwise be entitled to for the board of her child between the ages of four and ten years.

Another item of the account is the sum of $284.12 for clothing, $200 of which is charged in a gross sum without giving items or the cost of them, but it is claimed to be for hats, shoes, underclothing, and dresses; simply a guess at what Mrs. Bushnell supposed she might have expended during 12 years of her guardianship. Even were we disposed to allow the $84.12 for wearing apparel, we should decline the $200, because she has kept no account of the items, nor of their cost. It is an imaginary sum for imaginary wearing apparel for a period of 12 years; whether she has furnished this amount of clothing we do not know, and therefore have no reason to believe. Where one, not a parent, is guardian, he will not be presumed to have made gifts of clothing to his ward; but we think where a parent is guardian, having sufficient means of his own, or sufficient property of his ward in his possession, which, if invested, will produce sufficient income for his ward's necessary expenses, and he, under such circumstances, for many years supplies his child with clothing, without keeping an itemized account of it, he should be presumed to have given it to his child, and no allowance should be made for such gifts, unless the child's estate is so ample, and the parent's means so insignificant, that it would be a great hardship to compel the parent to support his child by his own exertions, or from his own property. We shall therefore hold as matter of law that where a parent is guardian, the child remaining at home, and the parent having the benefit of the society and services of the ward, and no account is kept of the items of wearing apparel furnished the child for a long period of time, the legal presumption of a gift to the child must be overcome by strong and undoubted evidence of a contrary intent. The bare fact of filing an account for such things, and making a claim for payment thereafter at the time of a final judicial settlement, will not overcome the legal presumption we have suggested.

The balance of the account is made up, with the exception of an Estey organ at $130, a gold watch and chain at $80, and articles of household furniture, amounting in all to $1,183.43; a partial list of the items being as follows: One French standing glass, $25; 16 yards lace curtains, $8; 67 yards of Brussels carpets, $71.45; 1 marble center-table, $16; 1 parlor suit of furniture, $70; expense on trip to Michigan, $35; rag carpeting, $25; bed-quilts and comfortables, $25; coverlids and woolen sheets, $7; 3 feather beds, $25; 3 white bed-spreads, $10; 1 pair white woolen blankets, $5.50; black walnut bedstead and 2 tables, $11.50; 1 rocker and 6 chairs, $8.50; 1 couch and corner stand, $12.50; 1 bureau and looking-glass, $15; jars, tin, and iron ware, $3.04, and various articles necessary and proper for housekeeping.

If May at the time this class of articles was purchased had been married, or was about to be, and so would need this household furniture, or was living away from home, and desired to furnish a room for her use, the expenditure of money for the purchase of the articles we have named would have been entirely proper; but, at the time they were purchased, she was living, unmarried, at home. If Mrs. Bushnell's house was reasonably well furnished with furniture, the articles purchased were unnecessary for her use. True, she might have desired her mother's house better furnished than it was, but, if Mrs. Bushnell was unwilling to expend her own money to gratify her daughter's wishes, she had no right to devote her ward's funds to such a purpose. These articles were put to immediate use in Mrs. Bushnell's house, and used as household goods are ordinarily used by parents and children. There was no exclusive use of them by May, and, although she is now married and living away from home, a large part of the articles charged against her by her mother have always remained at Mrs. Bushnell's. It is true they may have

been purchased by Mrs. Bushnell to gratify her daughter, but they were such goods as were necessary, probably, to adorn the house and make it a suitable and comfortable home for herself and daughter. They seem to be quite as appropriate and necessary for Mrs. Bushnell's use and comfort as for her daughter. After remaining, most of them, in the house for a number of years, used by Mrs. Bushnell in common with her daughter, she now says she can take them at the prices she paid for them. All of the articles seem to be such as are usually purchased by parents with which to furnish rooms in their houses for their own comfort and enjoyment, as well as for their children. There are no articles exclusively adapted to the use of May. They are only such as parents usually buy, without any intent to compel their children to pay for them at some future time, even if designed for their use and comfort, and to gratify their taste for household adornment. We discover no evidence in this case showing any design on the part of Mrs. Bushnell to charge her daughter with the value of the articles mentioned at the time she purchased them, and we decline upon this accounting to permit her under the circumstances surrounding this case, or connected with her guardianship, to change into a debt what we believe was a gift to her daughter, or intended to be a gift at some future time, if she did in fact purchase them at her daughter's suggestion, in order that her life might be made happier by having a few articles of household furniture suited to her station in life. We also make the same suggestion as to those articles that we did in regard to the wearing apparel, that there is no evidence showing that Mrs. Bushnell intended at the time she purchased the goods to make their value a charge against her ward's estate, and besides, if they were, her daughter's services, and the interest which would have accumulated upon the income of the $1,131.36, if invested, would nearly or quite equal the cost of the goods in question. There is yet another reason why we are justified in disallowing the charge made, and that is, they were a class of articles unnecessary at the time for the use of May, and the money was improperly, if not illegally, spent in their purchase; and Mrs. Bushnell, when she appropriated any part of the principal sum in her hands as guardian to the purchase of the articles referred to, without the permission and order of this court first obtained, ran the hazard of its approval and allowances and we do not approve of any such expenditure at the time it is claimed to have been made. It is a rule of law that no guardian may expend more than the income of his ward's estate without the consent of the court, although the court may afterwards ratify his acts in so doing. This proposition of law is put into our present Code, and we shall cite it hereafter. The guardian has the right to spend the income of his ward's estate for its support and education, if necessary. He has the right to spend so much of the principal as may be necessary for the same purpose, with the approval of the court. Without its approval, he must take the chance of losing what he thus illegally expends of the principal, even if his ward has had the benefit of it. Fatherless or motherless children are the wards of the court, and guardians are but its agents in the care of their persons and the management of their estates, and it is entirely proper that the court should be consulted in regard to the manner in which the funds of its ward are to be expended.

But, aside from the special reasons we have given for disallowing the entire account of the guardian, there is another ground for its rejection. It appears from the evidence in this proceeding that on or about the 18th day of October, 1870, Mrs. Bushnell purchased the 217 acres of land belonging to her two daughters, and gave a mortgage of $8,772.37 as security for the purchase price thereof to the county treasurer for the benefit of her two children. As guardian, she makes no report to this court as to what has become of the interest which should have accumulated upon May's undivided half interest in this mortgage for about 17 years, nor does she give any information to the

surrogate in relation thereto, nor, if no interest has ever been paid on the mortgage, does she account for the use of this land during all this time. As guardian, she was not, probably, obliged to account for this mortgage or its income, unless paid to her by the county treasurer, nor have we, as surrogate, any jurisdiction to inquire into the matter in this proceeding. The county treasurer's office is the proper place to make inquiry upon the subject; but, as surrogate of this county, we decline to be estopped by any technical rules of evidence, upon such an accounting as this, from obtaining information from unquestioned sources which will enable us to protect, as far as possible, the estates of minor children from the gross negligence, carelessness, or dishonesty of their guardians. We are advised by the county treasurer that, through misapprehension or misinformation in reference to their duties in relation to this mortgage, Mrs. Bushnell has never been compelled to pay any interest upon it, and that the several county treasurers down to 1888 have annually credited her with the interest due, and sent Mrs. Bushnell a receipt therefor, no money ever being paid them, upon the theory, as we understand, that she was entitled to have the interest repaid to her as guardian, and hence it would be a useless ceremony to have the interest money sent to them, only to be returned by next mail to Mrs. Bushnell.

As guardian she has been credited by the several county treasurers with annual interest for 16 years, amounting, at 6 per cent.,—less than the legal rate,—to the sum of $4,470.49; but, although she has neither paid to nor received from the county treasurer this amount of interest, she has all this time had the sole use of the land upon which the mortgage was given, for which as guardian she gives no account. May's share of the mortgage was $4,386.18, her share of the personal estate $1,131.36, making in all the sum of $5.517.54, which, at 6 per cent., would have amounted at this time, principal and interest, to the sum of $11,141.16; but if the interest had been collected on the amount, and reinvested since 1870, as it should have been, it would have amounted to a very handsome fortune when she became 21 years of age; not less than $15,000, and probably more. Unless May has some legal remedy for the damages she has sustained by the mismanagement of her property by those to whom the law has intrusted it, she will, so far as the interest on the mortgage is concerned, be obliged to take the land her father left her, depreciated as it must necessarily be in value, and worth to-day less than the face value of the mortgage at the time her mother gave it. So far as the interest on this mortgage is concerned, it may be a wreck without a remedy, but, so far as the personal estate is at issue, we have seen our way clear upon technical, though, we think, clearly legal, grounds to protect it from the acts of this incompetent guardian. Until Mrs. Bushnell can give a valid legal excuse for the non-payment of the interest which should have been paid annually to the county treasurer, or until she can show some legal ground why she should not account to this court, in some form, for the use of the real estate originally belonging to May, we must decline to allow her to take from a fund which is abundantly secured by her bondsmen, if she is not responsible, such expenditure as she claims she is entitled to, and for which she has filed a claim. Her entire account, therefore, is rejected, nor will she be allowed any commission as guardian, for the reason that she has mismanaged the estate of her ward, and subjected her to unnecessary expense by reason of the manner in which she has discharged the duties intrusted to her. She has from the beginning acted in constant violation of the law and of her duty to her child; she has not had the slightest regard for the simplest and plainest requirements of her position. The commission in this case would not be a large sum; but, whatever the amount, it should be withheld, not only as a matter of justice to May, but as a warning to other guardians who may, possibly, now be imitating, or who may hereafter imitate, the example of Mrs. Bushnell. The duties of guardian are simple and easy to perform. Obedience to the law makes

their task an easy one. They need not fear the result of their labor if, in the discharge of their duties, they have not listened to the voice of disobedience to the law and the plainest dictates of reason and honesty. The court, always lenient, striving to be just, will always look with kindly eye upon the dealings of guardians, where the duties of the office have been properly discharged; but where they have been unfaithful, neglected their duties, violated the law, have been guilty of gross carelessness and negligence, which is frequently but another name for dishonesty, no appeals to overlook such wrongs and such injustice to their wards should ever awaken the equitable powers of the court from their slumber to aid them in depriving these adopted children of the law from that which justly belongs to them. A decree will therefore be entered directing Harriet L. Bushnell, as guardian of May Burlingame, to pay her the sum of $1,121.36, with interest thereon at 6 per cent. from the 18th day of September, 1871, to the date of this decision, amounting to the sum of $2,288.32.

Having disposed of the questions at issue in this proceeding, we take occasion to make some suggestions to guardians and their bondsmen:

*First.* A guardian, as soon as the property of his ward comes to his hands, should make and file with the surrogate an accurate inventory of the property.

*Second.* If the funds of the ward are not invested when they come to the guardian's possession, he should invest them as soon as it can reasonably be done, and so far as possible keep the same and the income thereof invested till his ward becomes 21 years of age, or when, by reason of death or other causes, he is sooner called upon to account and pay over the funds to others.

*Third.* He should procure a book, and devote it exclusively to matters pertaining to the guardianship, and in it should be set down at the time of its occurrence every item of income and expenditure on behalf of the ward intended to be a credit or a charge against him.

*Fourth.* Receipts for all expenditures, except for trifling sums, should be taken and preserved until the final accounting.

*Fifth.* The guardian should expend no more than the income of the ward for his support and education, without an order of the court for that purpose obtained. Section 2846 of the Code is as follows: "Upon the petition of the general guardian of an infant's person or property, or of the infant, or of any relative or other person in his behalf, the surrogate, upon notice to such persons, if any, as he thinks proper to notify, may make an order, directing the application by the guardian of the infant's property to the support and education of the infant, of such sum as to the surrogate seems proper out of the income of the infant's property, or, where the income is inadequate for that purpose, out of the principal."

*Sixth.* In *Voessing* v. *Voessing,* 4 Redf. Sur. 360, the following is stated to be the law when the parent is the guardian of his child: "It is then no part of the duty of a guardian, simply as such, to contribute to the support of the ward out of his own funds, but it is the primary duty of a parent, whether father or mother, if of sufficient ability. Without regard to this duty, imposed by the law of nature, our statutes expressly recognize the obligation of the parent to prevent the child from becoming a public charge. If, however, the parent be also the guardian of a minor, having an estate of its own, then the circumstances of the parent, as well as the amount of the estate of the ward, may be taken into consideration in fixing the degree of and determining whether there is any liability of the former. *In re Burke,* 4 Sandf. Ch. 617; *In re Kane,* 2 Barb. Ch. 375; *Wilkes* v. *Rogers,* 6 Johns. 566. The same cases also establish the principle that an allowance may be made for past maintenance and support of a ward in a proper case. No inflexible rule can be established, but each case must be determined on the facts peculiar to it. The proper course to pursue, where the income is insufficient, is for the guardian to make application to the court for leave to use so much of the principal

as may be necessary; but, in case he proceed without such leave, the court may, if the proceeding seems to have been wise, and for the welfare of the ward, sanction it."

*Seventh.* We invite special attention to the following provisions of the Code: "Sec. 2842. A general guardian of an infant's property, appointed by a surrogate's court, must, in the month of January of each year, as long as any of the infant's property, or of the proceeds thereof, remains under his control, file in the surrogate's court the following papers: (1) An inventory containing a full and true statement and description of each article or item of personal property of his ward received by him since his appointment, or since the filing of the last annual inventory, as the case requires; the value of each article or item so received; a list of the articles or items remaining in his hands; a statement of the manner in which he has disposed of each article or item not remaining in his hands; and a full description of the amount and nature of each investment of money made by him. (2) A full and true account, in form of debtor and creditor, of all his receipts and disbursements of money during the preceding year, in which he must charge himself with any balance remaining in his hands  *  *  *  at the conclusion of the year, to be charged to him in the next year's account. Sec. 2843. With the inventory and account, filed as prescribed in the last section, must be filed an affidavit, which must be made by the guardian, unless, for good cause shown in the affidavit, the surrogate permits the same to be made by an agent or attorney who is cognizant of the facts. The affidavit must state, in substance, that the inventory and account contain, to the best of the affiant's knowledge and belief, a full and true statement of all the guardian's receipts and disbursements on account of the ward; and all money and other personal property of the ward which have come to the hands of the guardian, or have been received by any other person by his order or authority, or for his use, since his appointment, or since the filing of the last annual inventory and account, as the case requires; and of the value of all such property, together with a full and true statement and account of the manner in which he has disposed of the same, and all the property remaining in his hands at the time of filing the inventory and account; and a full and true description of the amount and nature of each investment made by him since his appointment, or since the filing of the last annual inventory and account, as the case requires; and that he does not know of any error or omission, in the inventory or account, to the prejudice of the ward. The surrogate must annex a copy of this and the last section to all letters of guardianship of the property of an infant issued from his court." We do not think guardians appreciate the importance of conforming to these positive commands of the law. Such a sworn statement has a tendency to impress upon them the necessity of keeping accurate accounts, and of making legal investments. In the next place, in case of the loss or destruction of their securities or accounts, they would find it not only a matter of convenience, but of safety, for them to have the annual records of their dealings with the trust-estate in possession of the court; and besides this, in case of their death, their heirs would have no difficulty in ascertaining the liability of the guardian. They would know where to find a statement of the guardian's relation with his ward. So, too, if any friend of the minor had reason to believe the interests of the ward were not properly taken care of, he would know where to ascertain the true condition of affairs, and could give such information to the surrogate as might be necessary to secure prompt action on his part to protect the ward's estate from injury. But we think the section of the Code above quoted should be amended so that, in addition to filing such a statement as the law requires with the surrogate in the month of January of each year, the guardian should also be required to serve a copy of his statement upon each of his bondsmen, in order that they may know the extent of their liability as bondsmen and the condition of the ward's estate. If a per-

son indorses a note, his liability generally ceases in a short time; if he signs an administrator's bond, the estate is ordinarily settled at the expiration of 18 months, and sometimes at the end of a year; but guardians' bonds run from a very short period up to 20 years.     We think men liable upon this class of bonds should have exceptional protection, and we know of no more certain and effective way than to require guardians to serve a copy of their annual statement upon their sureties.     The bondsmen could then determine whether the condition of the estate was such that they were willing to remain liable any longer upon the guardian's bond, and, if they did not so wish to remain, could then make application to the surrogate to be relieved from any further liability.     It is true the surrogate has no power to compel a guardian to serve a copy of his annual statement upon his bondsmen in the month of January in each year, but, if it is not hereafter done, we suggest that the sureties make application to the surrogate to be relieved from further liability, whereupon an order would be made requiring the guardian to file a new bond or to be removed from office.     Besides the protection which the bondsmen would receive by pursuing the course we have suggested, the minor would also receive additional protection to his estate, because the bondsmen, who have direct personal and financial interest in knowing the condition of his estate, and in watching over his affairs, would be in a condition to call the attention of the surrogate to any irregularities or mismanagement on the part of the guardian.     The present case illustrates the justice and advantages of such a course as we have pointed out, because, if the bondsmen had known the uses to which Mrs. Bushnell put her children's money, we presume they would not have remained long on her bond, and she would have been compelled by the surrogate to invest and keep invested the funds of her wards till they became of age, nor would there have been any loss to May of many thousand dollars upon the mortgage given to the county treasurer for her benefit.     As near as can be estimated, there is annually placed in the hands of guardians an average of not less than $50,000, and, if we assume a period of eight years as the average length of a guardianship, it will be seen that there is the sum of $400,000 in the hands of guardians, varying in amounts from very small sums to many thousands.     Bonds have been given for this amount by men who swear they are worth twice the sum above named, so that there are probably not less than 1,000 men in the county who are directly and financially interested in knowing the condition of the estate for which they stand as sureties, and in our judgment ought to know at stated intervals whether the trust fund is secure or not, and whether the guardians are properly discharging their duties.     Men will go upon such bonds with less reluctance if they know that they must be occasionally consulted in regard to the management of the estate, or, at least, be permitted to know its condition at frequent intervals. So, too, it would have a tendency to make guardians more careful if they felt that for every minor whose property was in their hands as guardian there were at least two responsible men watching over his affairs, and ready, at all times, to protect not only his person, but his property, from wrong.     It is important then that these estates, whether large or small, which have been left to these minor children, should be carefully watched and tended, and devoted to their interests and happiness.     A little help as they start out in life may be the means of moulding their destiny wisely; may be the stepping-stones to a life respected and honored by all.     To aid and protect them, the court is ever ready to listen to their appeals, its hands are always near to lead them in paths of safety, its doors are evermore ajar, awaiting the tread of every child to whom a wrong has been done.     In the closed bud of their unblossomed years lie sleeping, dreaming, the good or ill whose fruit may hereafter ripen upon the tree of life, and it is the duty of the court to see that the heritage which some father or mother has left them shall nourish its roots and make shapely the boughs from which the harvest must be gathered.

*Eighth.* Guardians should not loan the money of their wards upon personal security; for if they do so, and the maker of such securities subsequently becomes insolvent, they will be compelled to make good the loss to the estate, and in addition will be compelled to bear the expenses of litigation made necessary to collect the funds thus improperly invested. While the statutes of this state have not specified any particular class of securities in which trust funds should be invested, the courts have generally held that trustees must invest in loans on real estate, in the bonds of the state or of the United States, and that neither good faith, care, nor diligence will protect them in the event of loss, where this rule is departed from. No loan should be made upon real estate for more than half its value, and in every instance there should be an official search, showing a clear title to the land. If satisfactory securities cannot be obtained after reasonable efforts to do so, the money should be deposited in some savings-bank, where it will draw interest until securities can be obtained.

*Ninth.* Guardians should deposit all trust funds as soon as received by them in some bank of good repute, because if kept about their persons or in their dwellings, and the money is stolen or lost, or destroyed by fire, they will be liable for its loss. In *Cornwell* v. *Deck,* 8 Hun, 122, where an administratrix kept a large amount belonging to the estate in her house, and the same was stolen, the court held her liable therefor, and said that the trustee at the present time, when banks and places of safe deposit so largely abound, would be held liable for negligence, because a man of common prudence, and acting with caution, would not retain the custody of money or valuables liable to be stolen in such a place, when he could easily deposit them in a place of safety. It is repeatedly held that if a trustee, in the exercise of his best judgment, deposits money in a bank of good repute, he is not liable in the event of the failure of the bank. In Whart. Neg. § 519, and cases there cited, it is held that a guardian having funds of his ward should not keep them in his house, but deposit them in a bank. Again, these funds should be deposited to his credit as guardian, and not to his individual account in the bank, or mixed with his own funds; for if he mixes the trust funds with his own, and uses them in his business, he is liable to pay compound interest, not only as a penalty for his improper conduct in relation to the trust fund, but also to enable the ward to receive all the interest which his money would have earned if invested, and its accumulations kept reinvested.

*Tenth.* Under no circumstances, no matter how great the temptation, should guardians appropriate the money of the ward to their own use. This fund should be regarded as sacred against their touch for such a purpose. In a legal sense, the ward is their neighbor, and his castle should be secure against the uninvited steps of him who seeks to enter for an illegal purpose. And yet men who would not for a moment think of taking another's property without his consent, and devoting it to their own use, do not hesitate occasionally to appropriate funds in their hands as trustees to their own benefit, or the benefit of others. In order that guardians and others having trust funds in their hands may know the danger they run by appropriating such funds to their own use, may know the criminal character of such an act, and the penalties to which they may be subjected, we quote section 541 of the Penal Code: "A person acting as executor, administrator, committee, guardian, receiver, collector, or trustee of any description, appointed by a deed, will, or other instrument, or by an order or judgment of a court or officer, who secretes, withholds, or otherwise appropriates to his own use, or that of any person other than the true owner or person entitled thereto, any money, goods, thing in action, security, evidence of debt, or of property, or other valuable thing, or any proceeds thereof, in his possession or custody, by virtue of his office, employment, or appointment, is guilty of grand or petty larceny in such degree as is herein prescribed, with reference to the amount of such

property; and upon conviction, in addition to the punishment in this chapter prescribed for such larceny, may be adjudged to pay a fine, not exceeding the value of the property so misappropriated or stolen, with interest thereon from the time of the misappropriation, withholding, or concealment, and twenty per centum thereupon in addition, and to be imprisoned for not more than five years in addition to the term of his sentence for larceny, according to this chapter, unless the fine is sooner paid."

We have done. All the suggestions we have made in regard to the duties of guardians may be summed up in the words of Him who spake as never man spake: "Therefore, all things whatsoever ye would that men should do to you, do ye even so to them; for this is the law and the prophets." Do then unto these children thus placed in your care as you would that men should do to yours, if you shall pass away from earth in their youth, and you will have discharged your duties with fidelity to the trust reposed in you, and all your acts will meet with the approval of the court. '